United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ALEXANDRA ELSHIRBINY,

    Plaintiff,

  v.

JO ANNE B. BARNHART, Commissioner of Social Security,

    Defendant.
_____/

No. C 04-03662 WHA
Related to:
No. C 02-05698 WHA

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this social security appeal, the conclusion of the administrative law judge — that plaintiff's disability onset date was May 31, 2001, rather than June 9, 1998 — was supported by substantial evidence. Accordingly, plaintiff's motion for summary judgment is **DENIED** and defendant's motion for summary judgment is **GRANTED**.

## STATEMENT

### 1. PROCEDURAL HISTORY.

Plaintiff Alexandra Elshirbiny claims to suffer from various physical and psychological impairments. On November 4, 1999, she filed a protective application for disability insurance benefits under Title II of the Social Security Act; her application was filed on November 19, 1999 (AR 128–130).[1] Her disability report alleged she was unable to work since June 9, 1998, due to low energy, blurred vision, generalized body pain and other ailments (AR 134). Her

---

[1] A claimant may protectively file for disability benefits to preserve the earlier filing date without filing all the paperwork at the same time.

1  application was denied both initially on January 5, 2000, and upon reconsideration on
2  March 23, 2000 (AR 101–04, 106–10).
3      Plaintiff requested a hearing before an administrative law judge, which was held on
4  September 26, 2000, before ALJ Catherine R. Lazuran (AR 27–98). The ALJ rendered her
5  decision on May 30, 2001, finding that plaintiff suffered from various medical impairments, but
6  had the residual functional capacity for light work with some limitations, such that she was not
7  disabled because she was capable of performing her past relevant work (AR 14–26). Plaintiff
8  requested administrative review (AR 12–13). The Appeals Council denied the request on
9  September 27, 2001, rendering the decision of the ALJ the final decision of the Commissioner
10 of Social Security (AR 7– 8).
11     On June 11, 2001, plaintiff filed a second protective application for disability insurance
12 benefits (AR 557–59). This claim was denied initially on March 7, 2002 (AR 488–91). On
13 reconsideration, however, plaintiff was found disabled with an onset date of May 31, 2001 (AR
14 515–20). Meanwhile, on December 4, 2002, plaintiff filed the related action listed above (No.
15 C 02-05698 WHA), seeking judicial review of the unfavorable outcome of her prior application.
16 The parties stipulated to remand the case for further proceedings to determine if an earlier
17 disability onset date was reasonable; the stipulation was approved by order dated June 16, 2003
18 (AR 521–22).
19     Another administrative hearing was held on December 2, 2003, before Judge Lazuran
20 (AR 395–451). On January 30, 2004, the ALJ issued her second decision, finding plaintiff not
21 disabled during the period from June 9, 1998 through May 30, 2001 (AR 381–394). Plaintiff
22 wrote several letters objecting to the unfavorable decision on December 8, 2003 (AR 368–80).
23 The Appeals Council declined to resume jurisdiction (AR 365–67). On August 30, 2004,
24 plaintiff filed the instant appeal, again seeking judicial review pursuant to 42 U.S.C. 405(g).
25 The parties now make cross-motions for summary judgment.

    **2.**    **TESTIMONY AT THE ADMINISTRATIVE HEARING.**

        **a.**    **Hearing of September 26, 2000.**

Plaintiff was born on November 26, 1946; she was 53 years old at the time of her first hearing before the ALJ (AR 32). Plaintiff has a bachelor of science degree in electrical and electronics engineering (AR 34). Plaintiff testified that she had been employed over the past fifteen years in various jobs, including those of an office clerk, engineering technician, production worker, and exercise instructor (AR 37–41). These positions required her to answer phones, input data into a computer, file, organize, teach aerobics, and lift at most fifteen pounds (AR 38–41).

Plaintiff testified that she worked her last full-time job for Hewlett Packard through June 1998 doing testing, trouble shooting, and lifting 45 to 60 pounds each day (AR 35). While working for the company, she indicated she felt harassed because "they couldn't understand my point of view and they always blame[d] me for everything" (AR 72–73). She also claimed she developed work-related injuries, such as problems with her left hand and back pain (AR 35–36, 76). Plaintiff asserted that Hewlett Packard involuntarily terminated her on June 9, 1998, because she filed a worker's compensation form (AR 36). She explained that Hewlett Packard, however, provided a different explanation for her discharge, stating that she failed her duty to train another employee and disrupted her co-workers (*ibid.*). In response, plaintiff filed discrimination and retaliation claims (AR 37).

Plaintiff indicated that she tried to look for employment after June 1998, but could not because "the pain was still continuing" and she did not think she could handle any of her previous work positions (AR 42, 64, 72).[2] Plaintiff elaborated that she suffered from muscle strain, fatigue, blurred vision, nosebleeds, vomiting, and chest pain (AR 42, 61, 66, 69, 74). She attributed many of these conditions to microwave radiation, which she claimed she was exposed to while working sixteen-hour shifts at Hewlett Packard (AR 65, 66, 69–71). Plaintiff

---

[2] Plaintiff's alleged disability onset date was referred to as June 9, *1999*, in the hearing transcript of September 26, 2000 and the ALJ's order dated May 30, 2001. This date was later corrected to June 9, *1998*, in the hearing transcript of December 2, 2003 and the ALJ's order dated January 30, 2004.

3

indicated that her chest pain was so severe that she "contemplated calling an ambulance," but did not because she was concerned about the cost (AR 74–75). Plaintiff also explained that her arms and lower back prevented her from working (AR 46, 76). She claimed these conditions prevented her from "even do[ing] the basic house chores" (AR 45–46).

Additionally, plaintiff testified that her inability to stand, sit, and walk for extended periods in an eight-hour period prevented her from working. Plaintiff stated she could "probably stand for 45 [minutes], an hour," though only by struggling (AR 47). She also indicated that she had trouble sitting for more than 30 to 45 minutes (*ibid*.). Moreover, walking for even ten minutes exhausted her (AR 48).

After leaving Hewlett Packard, plaintiff indicated that she relied on state disability for a year (AR 43). Plaintiff also claimed she applied for disability income through the Disability Service Center's Voluntary Plan, but was denied relief because she "wasn't being treated at the time, or examined" and she "was not declared disabled" before she left Hewlett Packard (AR 43–44). She then applied for social security disability (AR 45).

Plaintiff testified that she first saw a doctor in March 1999 when Redwood Chiropractic offered her a free X-ray evaluation (AR 49). She claimed the chiropractor "saved my life" because "[w]ithout [a] regular chiropractic, I probably would be still in bed, would be every ten minutes unable to do anything with my arms. And maybe I don't know, I could have been dead from just being in bed" (AR 49).

As for psychological treatment, plaintiff stated that in May 2000, Dr. Sandra H. Klein, a doctor selected by a worker's compensation attorney, recommended that she see a counselor (AR 59–60). On June 6, 2000, plaintiff explained that she also saw Dr. Andrew D. Whyman, Hewlett Packard's psychiatrist (AR 50). Plaintiff indicated that while she could not remember whether Dr. Whyman had stated she had a mental problem, plaintiff recalled that Dr. Whyman "did say something about [being] narcissistic" (*ibid*.).

As for her vision, plaintiff testified that she used glasses, although they "don't help with the blurred vision" (AR 51). She claimed that her blurred vision, which began before she left Hewlett Packard, occurred "every time I read or use a [computer] screen" (AR 51–52).

4

Regarding difficulty with her right shoulder, plaintiff testified that she began feeling pain two months prior to filing a worker's compensation claim on November 5, 1997 (AR 53). Plaintiff explained that with her right arm she was able to "maybe lift a Kleenex tissue," but not use it to eat (*ibid*.).

As for her hearing problems, plaintiff testified that they began in junior college when she "had a bad ear infection that lasted about a year and a half" (AR 55). She claimed she could hear normal conversations, but had to focus on "seeing the person's lips" because "[i]f you turn around then I won't hear" (*ibid*.). Plaintiff further indicated she could not hear a phone conversation without the assistance of a device (AR 58). Moreover, she explained she could only use her right ear to hear on the phone (*ibid*.).

With regard to her sleeping pattern, plaintiff claimed she usually slept fourteen hours during the night, although insomnia occasionally prevented her from sleeping (AR 59). During the day, plaintiff explained she spent ten to twelve hours lying down (*ibid*.). Plaintiff testified she would wake up to shower, although her "hair ha[d] been washed less and less. Once every two, three weeks, four weeks" (AR 60–61). She indicated she did not exercise, take walks, or attend religious services (AR 61). Plaintiff acknowledged, however, that she had "been driven to watch some ice hockey in San [sic] Rosa a couple of times" (AR 64).

On examination by her attorney, plaintiff indicated that some of her conditions had begun to improve. Regarding her right hand, plaintiff stated "now I can lift it up and maybe put it on the table" (AR 67). She claimed, however, that her neck and shoulder had not improved (AR 67–68). On a scale from one to ten, with ten being the worst pain she could imagine, plaintiff testified that her back pain was "more than ten" (AR 76). On the same scale, plaintiff rated her monthly chest pain and regular heart pounding "always at nine" (74–75).

In response to questions asked by Richard Hincks, a vocational expert ("VE"), plaintiff testified that she never worked as an engineer though she held a degree in engineering (AR 80–81). Plaintiff also confirmed that she was deaf in her left ear, though not from a work injury (AR 81).

5

The VE himself then testified and summarized plaintiff's work history, beginning with her most recent position: electronics technician; clerk typist; engineering technician; electronics wave operator; deburrer; personal trainer and exercise instructor (AR 81–82). The VE identified transferrable skills that plaintiff had acquired during her previous fifteen years of employment (AR 83):

> ... she has several skills relating to both her education and her work experience in electronics and engineering. They involve — or include rather, precision measurements, and using precision testing equipment, being able to understand and read complex engineering drawings, electronics schematics. She has some keyboarding skills. She has electrical engineering theory and principal or the understanding of electrical — electronic and electrical engineering principals and theory.

The ALJ posed a hypothetical to the VE with the following limitations: person of plaintiff's age, education, and past relevant work experience, where person "can do light work with no overhead work with the right dominant arm," and "this person should not do pushing or pulling with the right shoulder and should avoid power grasping or prolonged find [sic] digital manipulation with the right arm" (AR 84). The VE testified that such a person could work as an electronics technician, engineering technician, and clerk typist (AR 85).

The ALJ then modified the hypothetical with the following additional limitations: "person can do simple repetitive tasks, has a slight problem with pace, and a moderate limitation regarding the ability to relate to other people beyond giving and receiving instructions" (*ibid.*). The VE testified that such a person could not be employed in plaintiff's previous work positions (*ibid.*). He indicated, however, that the person could perform some "unskilled, light jobs," such as a production assembler, electronics worker, and sorter (AR 86–87). If the ALJ added to the hypothetical that the person could do occasional stooping and crouching, the VE testified that the person could still be employed in these three jobs (AR 87).

In response to questions posed by plaintiff's attorney regarding whether any of the aforementioned six jobs could be performed if the hypothetical person also suffered from a 40 to 45 percent hearing loss, the VE stated that "all three of the production — unskilled production jobs could be performed with that type of hearing profile" (AR 89). When asked whether any of the jobs would accommodate an employee who required lying down every time

6

she completed a task, the VE testified that the person "couldn't work" (AR 90–92). The VE further testified that the person could not perform any of the six jobs during a nosebleed episode (AR 92).

The ALJ concluded by posing a third hypothetical to the VE, adding to the second hypothetical that the person had "moderate difficulty with complex and varying tasks" (AR 95). The VE testified that these new limitations did not alter his responses to the ALJ's previous two hypotheticals (*ibid*.).

### b. Hearing of December 2, 2003.

At the second administrative hearing, plaintiff's testimony regarding her past employment, symptoms, and her daily activities was substantially similar (AR 404–451). Plaintiff testified that her work history consisted of several jobs, including those of a clerk, engineering technician, deburrer, sizer of disks, and fitness instructor (AR 406–09). After leaving Hewlett Packard, plaintiff indicated that she neither looked for employment nor volunteered to work (AR 409–10). She testified that for a source of income she relied on unemployment benefits for six months, state disability for one year, and currently collected social security (AR 410). Plaintiff explained that she could not work after June 1998 because she suffered from severe pain due to a "frozen shoulder," "vomiting," "gastrointestinal" problems, and "blurred vision" (AR 411–12). She attributed her main inability to work, however, to "chronic fatigue," which she indicated began before she stopped working (AR 411).

When asked whether her condition had improved since June 1998, plaintiff responded "I'm a little better, but I'm in the meantime getting worse" (AR 412). Plaintiff testified that she suffered from weight loss and weighed 105 pounds whereas she usually weighed around 130 pounds (AR 404). She also indicated that despite extreme pain, she could occasionally lift her cup of coffee with her left hand (AR 405, 413). Plaintiff claimed that Dr. Jack Kundin, a doctor for social security, discovered that her hand was "severely injured" and became visibly perturbed "because he kept poking me with a pin and I had no feelings at all" (AR 413).

7

Plaintiff also testified to her difficulties standing, sitting, and walking during an eight-hour period. She indicated that she could stand for 30 to 45 minutes if she pushed herself, and attributed her inability to stand for longer to her heart palpitations (AR 413–14). Plaintiff claimed that her chiropractors, Dr. Taatjes and Dr. Lorenzen, who she had seen since March 1999, restricted her sitting to twenty minutes (AR 414–15). Plaintiff also surmised that she could walk for ten minutes (AR 415).

Regarding her sleep pattern, plaintiff claimed she slept an average of sixteen hours a night unless she had insomnia (AR 416). She testified that she used to lie down "for days," but "now I could like [sic] down for four, five or six hours and get up" (*ibid*.). During her waking hours while not lying down, plaintiff explained that she minimized her activity. Approximately once a week, plaintiff indicated she showered (AR 417). Occasionally, "with great difficulty," plaintiff claimed she dressed herself and left her home (AR 421). She indicated she seldomly used a computer because she suffered from "severe pain everywhere," "nose bleeding," and "nearly passed out one time when [her] head slammed forward" (AR 423). Plaintiff also testified that she never contributed to any housework, went for walks, or attended church (AR 421–22).

With respect to her mental state, plaintiff testified that she saw two doctors. Plaintiff claimed that Dr. Sandra H. Klein diagnosed her with "acute anxiety," and Dr. Ronald F. Johnson determined she had "depression" (AR 417). Besides taking herbal supplements, plaintiff indicated that she never pursued further psychological treatment because she lacked resources to pay the medical bills (AR 417, 420). When asked whether she thought she had a severe psychological problem, plaintiff responded that her severe distress, anxiety, and extreme irritability suggested "I've got to have something" (AR 419).

Medical expert ("ME") David J. Anderson, a board-certified psychiatrist, then testified that the record revealed "a difference of opinion among various physicians evaluating the Claimant from an orthopedic standpoint" (AR 428). Specifically, the ME noted that Dr. Johnson's report was "far more sympathetic" than Dr. Klein's report to plaintiff's claim (AR 436). Overall, however, the ME attributed the difference mainly to emphasis and

8

interpretation (AR 428). In fact, the ME indicated that Dr. Klein and Dr. Whyman were "surprisingly in agreement" (*ibid*.).

Based on his education, medical experience, and review of the medical records, ME Anderson testified that plaintiff had "an impairment based on a chronic pain syndrome," dating back to 2000 when Dr. Klein examined plaintiff (AR 429). ME Anderson explained that chronic pain syndrome was the only psychological or psychiatric impairment present in plaintiff (*ibid*.). He attributed this impairment to plaintiff's "coping style or personality style" (AR 430). Furthermore, the ME indicated that the impairment did not meet any listing in the social security regulations (AR 429, 432).

ME Anderson also rated plaintiff's activities of daily life as "moderately restricted" (AR 432). He surmised that the restriction to plaintiff's daily activities, social functioning, concentration, persistence, and pace began in February 2002 (AR 433, 435).

The VE, Stephen P. Davis, then summarized plaintiff's work history, including the skill and exertion levels required by those jobs: (1) electronics technician — a skilled, medium exertion job; (2) lathe operator — a skilled, medium exertion job; (3) deburrer — an unskilled, heavy exertion job that plaintiff performed at medium exertion; (4) data entry clerk — a semiskilled, sedentary job; (5) fitness instructor — a light duty job; and (6) production line assembler — a light duty job (AR 442). The VE identified transferable skills plaintiff had acquired from these positions (AR 442–43):

> ... knowledge of tools, machines, materials and methods used in a craft specialty. The ability to read scale drawings of blueprints. The ability to use shop math to calculate object dimensions, as well as material amounts needed. And the ability to adhere to object specifications or standards. ....
>
> ... the ability to set up machines and to adjust machines, the ability to read blueprints, as well as wiring diagrams and other work specifications, the ability to inspect products for conformance, prescribe specifications.

The ALJ posed a hypothetical to the VE with the following limitations: person of plaintiff's age, education, and past relevant work experience, where person can "lift 20 pounds occasionally and ten pounds frequently, is able to stand, walk, and sit six hours each of eight hours," "[c]an occasionally stoop and crouch," "[s]hould avoid overhead work and overhead pushing and pulling and also avoid power grasping and prolonged fine manipulation with the

9

dominant right upper extremity," and must "avoid an extremely noisy work environment" (AR 443–44). The VE testified that such a person could not be employed in plaintiff's previous work positions (AR 445). He indicated, however, that the person could work as an information clerk, order clerk, and insurance clerk (*ibid.*). The VE testified that the person could still perform these jobs if the person were able to do sedentary rather than light work (AR 446).

The ALJ then modified the hypothetical with the following additional limitations (AR 446–47):

> Person has a very slight limitation regarding ability to comprehend and follow instructions and perform simple, repetitive tasks, and a slight to moderate limitation regarding ability to maintain a work pace and persist appropriately, and a moderate limitation regarding ability to perform complex tasks, relate to others beyond giving and receiving instructions, influence people, make evaluations, and accept and carry out responsibility for directions, control, and planning....

The VE testified that the person could work as an information clerk, order clerk, or insurance clerk, "but with ten percent erosion" (AR 447).

### 3. MEDICAL EVIDENCE.

The medical evidence was summarized in the ALJ's decisions (AR 18–24; 386–92). This order will also briefly review both plaintiff's self-reported symptoms and the findings of physicians who examined her.

#### a. Physical Impairments.

Dr. Rony Kako, a board-certified internist, examined plaintiff on December 11, 1999 (AR 228–30). Plaintiff made several complaints, but Dr. Kako found "minimal objective findings" to support plaintiff's assertions (AR 230). Dr. Kako observed that plaintiff appeared "well" and in "no distress" (*ibid.*). Plaintiff heard normal conversational tones "without significant difficulty" (AR 229). Based solely on the examination, Dr. Kako noted that plaintiff could lift "20 lbs occasionally, 10 lbs frequently," "stand and walk 6 hours in an 8 hour day, "do occasional stooping and crouching," and "use small hand tools" (AR 230).

Dr. Gary P. McCarthy, an orthopedic surgeon, examined plaintiff on January 31, 2000 (AR 242). Plaintiff indicated she had neck, shoulder, and upper extremity injuries (*ibid.*). Dr. McCarthy reported that plaintiff suffered from a "disability to her neck precluding Heavy Work" (AR 249). He also noted that plaintiff was "precluded from Overhead Work, Pushing

and Pulling," as well as "restricted from Power Grasping as well as Prolonged Fine Digital Manipulation" (*ibid*.).  Dr. McCarthy was of the opinion that plaintiff's knee and lower back injuries were not industrially related (AR 250).  Dr. McCarthy concluded that plaintiff could not return to work as an electronics technician but was a candidate for vocational rehabilitation (*ibid*.).

As reported in her letter dated May, 15, 2000, Dr. Sandra H. Klein, a psychologist, conducted an examination of plaintiff on April 27, 2000 (AR 268).  Plaintiff reported chronic pain symptoms in her upper extremities, back, right knee, and fatigue (AR 269).  Plaintiff voiced concern that her symptoms were related to microwave exposure (*ibid*.).  Due to her chronic pain symptoms, plaintiff indicated that she could not resume employment, and experienced difficulty driving and doing housework (AR 269–70).

Dr. Klein noted that plaintiff "continues to experience significant physical symptoms" but found "no evidence of motor abnormalities" in plaintiff (AR 269, 272).  Dr. Klein reported that plaintiff may have been "preoccupied with physical symptoms due to legitimate, objectively demonstrated medical conditions" (AR 274).  Dr. Klein diagnosed plaintiff with "[p]ersistent pain symptoms and sleep disturbance" and a "psychiatric adjustment disorder which has developed predominantly in reaction to her physical disability" (AR 274–75). Lastly, Dr. Klein found no "presence of previous functional impairments on a psychiatric basis" (AR 276).

In a report dated July 3, 2000, Dr. Andrew D. Whyman, a psychiatrist, indicated that he conducted a psychiatric consultation of plaintiff on June 6, 2000 (AR 282).  Plaintiff reported difficulties with her hands, arms, shoulders, back, neck, right knee, blurred vision, fatigue, and nose bleeding (AR 282–83).  She indicated her sleep pattern "varied" from fourteen hours to hardly any hours (AR 287).  Plaintiff also reported a poor appetite and loss of weight (*ibid*.). She attributed her difficulty with shopping and cooking to physical pains (AR 288).  Plaintiff reported she drove locally and managed to watch her nephew play in a few ice hockey matches in Santa Rosa and San Jose (*ibid*.).

11

1	Dr. Whyman diagnosed plaintiff with a "Pain Disorder with Psychological Features"
2	(AR 300).  He noted that plaintiff showed evidence of a "Pain Syndrome with considerable
3	volitional symptom enhancement" (AR 302).  Dr. Whyman indicated plaintiff's representations
4	of her pain levels and disability were "not consistent" with objective findings (*ibid*.).  Lastly,
5	Dr. Whyman was of the opinion that plaintiff had not worked as a "matter of choice rather than
6	illness and/or disability" (AR 305).

7	As part of plaintiff's comprehensive psychiatric examination conducted by Dr. Whyman
8	on June 6, 2000, plaintiff completed a series psychological tests (AR 306).  Dr. Alan D.
9	Shonkoff, a psychological examiner, reported on the results of plaintiff's tests in a report dated
10	June 13, 2000 (AR 306–08).  Dr. Shonkoff noted that plaintiff displaced her "underlying
11	negative feelings through amplified physical complaints" (AR 306–07).

12	On October 10, 2000, Dr. John Romano, an audiologist, evaluated plaintiff's hearing
13	loss (AR 320–21).  Dr. Romano reported that plaintiff had bilateral loss in both ears, although
14	her left ear was worse (AR 320).  He noted that plaintiff's hearing loss began twelve years prior
15	to the examination (*ibid*.).  Specifically, Dr. Romano reported that plaintiff's left ear had
16	"moderate to severe mixed hearing loss" of "unknown etiology" (*ibid*.).  Plaintiff's right ear had
17	"mild hearing loss" (*ibid*.).  Dr. Romano noted that the results compared "closely to an
18	audiogram performed 2 years ago" (*ibid*.).  He recommended that plaintiff wear a hearing aid,
19	but plaintiff apparently rejected the remedy due to the "discomfort" of wearing hearing aids
20	(AR 321).  Dr. Romano also presented plaintiff with the remedy of "surgical exploration with
21	possible stapes surgery" (*ibid*.).

22	Dr. Raymond Severt provided a medical-legal evaluation of plaintiff in a report dated
23	November 21, 2000 (AR 717).  He reported that plaintiff complained of pain in her upper
24	extremities, but found "no objective evidence of pathology" (AR 720).  Consistent with his
25	December 3, 1997 diagnosis, Dr. Severt indicated that none of plaintiff's symptomatology were
26	related to work (*ibid*.).  Dr. Severt was under the opinion that plaintiff could resume her
27	previous position at Hewlett Packard (*ibid*.).

28

In a report dated September 8, 2001, Dr. Jack Kundin, a neurologist, noted that plaintiff complained of chronic fatigue, pain in her right shoulder, and hearing loss (AR 757). Plaintiff also reported a 25 pound weight loss over the previous year (*ibid.*). Dr. Kundin noted that plaintiff had an uncorrected visual acuity of 20/100 in her right eye and 20/70 in the left eye (AR 758). He observed that plaintiff could not hear normal conversation speech out of her left ear (*ibid.*). Plaintiff appeared to have a "frozen" right shoulder (*ibid.*). Dr. Kundin diagnosed plaintiff with "adhesive capsulitis" in her right shoulder, and "chronic fatigue syndrome with weight loss of undetermined etiology" (AR 759). He concluded that plaintiff had no primary neurological disorder, was objectively disabled by her frozen right shoulder, and subjectively disabled by her chronic fatigue syndrome (*ibid.*).

On July 22, 2002, Dr. Jay Chun, a neurologist, conducted a comprehensive orthopedic evaluation of plaintiff (AR 775). Plaintiff reported neck pain, lower-back pain, and chronic fatigue syndrome (*ibid.*). She indicated she could not perform housework, though she could walk briefly throughout her home (AR 776). Dr. Chun observed that plaintiff had 20/100 vision in both eyes, and walked with a slight gait (*ibid.*). He diagnosed plaintiff with neck pain, low back pain, and chronic fatigue syndrome (AR 778). Dr. Chun concluded that in an eight-hour work day, plaintiff could stand or walk for six hours with frequent rests, and sit for less than six hours with frequent position changes (*ibid.*). Dr. Chun also restricted plaintiff to carrying twenty pounds, and noted that she could occasionally stoop (*ibid.*).

Dr. Ronald F. Johnson, a psychiatrist, examined plaintiff on August 5, 2002 (AR 779). Plaintiff repeatedly complained of physical distress (AR 781). Dr. Johnson found "ample evidence of a pain disorder and an anxiety disorder" (AR 779). He noted that plaintiff experienced her physical conditions in such a way as "to carry the further burden of depressive issues" (AR 781). Dr. Johnson diagnosed plaintiff with a "pain disorder associated with both psychological factors and medical condition" (*ibid.*).

In March 2003, plaintiff returned to Dr. Harris, an optometrist who she first saw in November 1995 for prescriptive lenses, to inquire whether her vision problems were due to microwave radiation (AR 206–07, 817). Dr. Harris indicated plaintiff had "healthy" eyes

13

except for a common slight "nuclear sclerosis" of her lenses, which is an early sign of cataracts (AR 817). He attributed this finding to plaintiff's age rather than to past exposure to microwave radiation (*ibid.*).

To address her pain, plaintiff also saw a number of chiropractors at Redwood Chiropractic (AR 819–834). The ALJ gave less weight to the opinions of the chiropractors because "chiropractors are not acceptable medical sources under the Social Security Administration's regulations" (AR 390).

According to a disability slip dated July 31, 2003, Dr. Joel Taatjes, a chiropractor, placed plaintiff on "permanent disability" on March 16, 1999 (AR 819). Dr. Taatjes reported that plaintiff was disabled due to "cervical segmental dysfunction," "cervicobrachial syndrome, "gleno-numeral adhesive capsulitis," and had a "50% pre-injury capacity" (*ibid.*). He noted that plaintiff could not engage in repetitive hand use, lifting in excess of five pounds, excessive head/neck flexion, or prolonged sitting (*ibid.*). Dr. Taatjes therefore concluded that plaintiff was a "medically elligible [sic] injured worker" (AR 820).

After plaintiff's disability diagnosis by Dr. Taatjes, Dr. Shawn Lorenzen, a chiropractor, examined plaintiff on October 8, 1999, March 29, 2000, and May 31, 2000 (AR 280, 828, 830). At the October 1999 examination, Dr. Lorenzen noted that plaintiff's condition was "improving slowly" (AR 280). Dr. Lorenzen found that plaintiff had "ongoing neck and upper back pain" in addition to the "inability to sleep through the night because of pain" (*ibid.*). Accordingly, he recommended that plaintiff avoid "lifting," "prolonged sitting," "excess hand/neck flexion," and "excessive use of hands" (*ibid.*). On subsequent examinations, Dr. Lorenzen reiterated the same work limitations for plaintiff due to her recurrent neck pain, headaches, and upper back pain (AR 827, 830).

On March 27, 2001, at the request of Dr. Taatjes, Dr. David P. Armstrong, a chiropractor, performed a permanent and stationary evaluation of plaintiff (AR 323). Plaintiff complained of pain in her head, neck, upper extremities, left hand, shoulder blades, lower back, right thigh, right calf and right foot (AR 325). She also reported nosebleeds, chronic fatigue, tendinitis of the upper extremities, blurred vision, and anxiety (*ibid.*). Dr. Armstrong identified

14

in plaintiff "elevation of the left hemipelvis, and the right shoulder girdle, decreased lumbar lordosis and increased thoracic kyphosis" (AR 326). He reported plaintiff's "condition appears to be permanent and stationary" and did not believe that her condition would improve with time (AR 329). Dr. Armstrong noted plaintiff's condition precluded her from returning to Hewlett Packard and conducting "heavy work" such as "bending, stooping, pushing, pulling, climbing" (AR 330–31). Dr. Armstrong concluded that plaintiff's physical and psychological complaints were "a direct result of her industrial exposure" (AR 330).

### b. Mental Impairments.

While undergoing a psychiatric examination by Dr. Sandra H. Klein on April 27, 2000, plaintiff discussed her emotional symptoms (AR 269). Plaintiff indicated that she felt Hewlett Packard's disciplinary actions of her were unjustified (AR 270). Plaintiff reported feeling shocked and demoralized by her termination (*ibid.*). Plaintiff attributed her subsequent inability to interview successfully for jobs to her fatigue and lack of energetic demeanor (AR 269–70). Plaintiff reported feelings of sadness, anger, and distress over her perception that she could not get out of bed (AR 269). Plaintiff also indicated that she experienced psychiatric symptoms in response to chronic pain and sleep disturbance (AR 274).

Based on testing and observation, Dr. Klein reported "no evidence of significant depression, anxiety, irritability, or euphoria" in plaintiff (AR 272). Reviewing plaintiff's MMPI questionnaire, Dr. Klein found that plaintiff may have had "a tendency to convert emotional difficulties into somatic complaints" and deny psychological problems (AR 273–74). Due to plaintiff's "increased irritability, anxiety, and variable cognitive functioning," Dr. Klein reported that plaintiff was precluded from resuming her previous employment (AR 276). Lastly, Dr. Klein diagnosed plaintiff with an "adjustment disorder," "[p]sychological and environmental problems," and a current GAF of 70 (AR 274).

On June 6, 2000, Dr. Andrew D. Whyman examined plaintiff (AR 282). Plaintiff indicated she felt she had no "psychiatric problems," but believed she had "emotional problems" (AR 287). Plaintiff reported she felt irritable, betrayed, underappreciated, and angry (*ibid.*). Dr. Whyman reported that plaintiff showed "no evidence of any form of anxious or

15

1  depressive disorder" (AR 291). Dr. Whyman also found no "thought disorder" or "cognitive
2  disruption" (AR 292). Plaintiff appeared to have "little appreciation of her impact on others"
3  (*ibid*.). Dr. Whyman diagnosed plaintiff with a "Personality Disorder NOS with narcissistic,
4  histrionic, dependent, and passive-aggressive features" (AR 300). He noted that plaintiff tended
5  to view herself as "victimized" and "unfairly treated" (*ibid*.). Dr. Whyman also reported that
6  plaintiff had "substantial interpersonal hypersensitivities" (*ibid*.). Ultimately, Dr. Whyman
7  found "no indication of a psychiatric illness" (AR 303). Dr. Whyman was of the opinion that
8  plaintiff's emotional symptoms did not preclude her from resuming employment (AR 305).

9  Based on psychological tests conducted as part of Dr. Whyman's June 2000
10  comprehensive examination of plaintiff, Dr. Alan D. Shonkoff reported that plaintiff was a
11  "notably histrionic and dependent individual who tends to characterologically displace
12  underlying feelings through excessive somatic complaint" (AR 307–08). Dr. Shonkoff placed
13  plaintiff in the "average intelligence" range (AR 307). Dr. Shonkoff also reported "no evidence
14  of significant anxiety, tension, or depressive mood" (AR 306–07). In fact, Dr. Shonkoff found
15  "no clinically significant level of anxiety or depression" (AR 308).

16  On August 5, 2002, Dr. Ronald F. Johnson conducted an examination of plaintiff (AR
17  779). Dr. Johnson reported that plaintiff showed a "very diminished psychological perspective"
18  (AR 780). He noted that plaintiff revealed "anxious tension and clinical depression" (AR 779).
19  Dr. Johnson reported that plaintiff's depression was manifested in her weight loss (AR 781).
20  Dr. Johnson diagnosed plaintiff with an "anxiety disorder due to underlying medical condition,"
21  and "avoidant, depressive, compulsive, and some paranoid personality traits" (*ibid*.).
22  Dr. Johnson concluded that he found it "difficult to imagine her functioning effectively with
23  others in a focused and productive pattern of work tasks" (AR 782). Dr. Johnson, however,
24  found plaintiff capable of managing supportive funds (*ibid*.).

25  In sum, plaintiff's case has involved at least sixteen doctors, experts and other
26  witnesses, all of whom were considered by the ALJ. The ALJ held that the evidence did not
27  support an earlier disability onset date of June 9, 1998, instead of May 31, 2001 (AR 394). This
28  order finds that substantial evidence supports the ALJ's determination.

16

**ANALYSIS**

**1.    LEGAL STANDARD.**

A decision denying disability benefits must be upheld if it is supported by substantial evidence and free of legal error. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). Substantial evidence is "more than a scintilla," but "less than a preponderance." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ibid*. The Court must "review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion." *Andrews*, 53 F.3d at 1039. "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities;" thus, where the evidence is susceptible to more than one rational interpretation, the decision of the ALJ must be upheld. *Ibid.*

The claimant has the burden of proving disability. *Id.* at 1040. Disability claims are evaluated using a five-step inquiry. 20 C.F.R. 404.1520. In the first four steps, the ALJ must determine: (i) whether the claimant is working, (ii) the medical severity and duration of the claimant's impairment, (iii) whether the disability meets any of those listed in Appendix 1, and (iv) whether the claimant is capable of performing his or her previous job; step five involves a determination of whether the claimant is capable of making an adjustment to other work. 20 C.F.R. 404.1520(a)(4)(i)–(v). In step five, "the burden shifts to the Secretary to show that the claimant can engage in other types of substantial gainful work that exists in the national economy." *Andrews*, 53 F.3d at 1040. If the ALJ chooses to use a vocational expert, hypothetical questions asked "must 'set out all of the claimant's impairments.'" *Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001)(internal citation omitted).

**2.    THE ALJ'S FIVE-STEP ANALYSIS.**

This order focuses exclusively on the ALJ's decision after the parties stipulated to remand for further proceedings. In her decision, the ALJ found at step one of the sequential evaluation process that plaintiff had not performed any substantial gainful activity for more than twelve continuous months since the alleged disability onset date (AR 386, 393). At step two,

the ALJ found that some of plaintiff's impairments were severe, including lumbosacral strain, cervical strain, a frozen right shoulder, and hearing loss (AR 389, 393). Plaintiff's pain disorder and blurred vision were found to be nonsevere (*ibid.*). Despite finding that plaintiff suffered from various impairments, the ALJ determined at step three that plaintiff did not meet or equal the severity of the listings in Appendix 1, Subpart P, Regulations No. 4 (*ibid.*). At step four, the ALJ relied on updated evidence and testimony from the vocational and medical experts and found that plaintiff was not capable of performing her previous job (AR 392–93). Nonetheless, at step five the ALJ found that plaintiff had a residual functional capacity to perform other jobs that existed in significant numbers in the national and regional economies (AR 392–94). The ALJ thus concluded that plaintiff was not disabled at any time from June 9, 1998 through May 30, 2001 (AR 393).

### 3. THE ALJ'S CONCLUSIONS WERE SUPPORTED BY SUBSTANTIAL EVIDENCE AND CONTAINED NO LEGAL ERRORS.

Plaintiff, acting *pro se*, argues that the ALJ erred in failing to consider medical evidence which she asserts demonstrates her severe impairments existed in May 2000.[3] The Court is not persuaded. *First*, plaintiff asserts that the ALJ made the same errors which were reversed in the related action listed above. This misconstrues the procedural history. The parties *stipulated* to remanding this case for further proceedings before the ALJ (AR 521–22). The Court made no substantive rulings in the prior action. *Second*, plaintiff is not a medical expert. Her personal opinions about her own medical history are given no weight. *Third*, even if the medical evidence did demonstrate that plaintiff suffered from severe medical impairments since May 2000, this would not entitle her to claim an even *earlier* disability onset date of June 9, 1998. (This is allegedly the date plaintiff last engaged in substantial gainful activity, so it would be plaintiff's earliest possible disability onset date as per step one of the sequential evaluation process.) *Fourth*, even assuming *arguendo* that her medical impairments were severe as of May 2000, plaintiff appears to misunderstand the law, perhaps assuming that she would be entitled to

---

[3] Plaintiff was represented by her attorney, Ms. Carolyn A. Young, in prior proceedings. Ms. Young subsequently withdrew her representation and plaintiff is now acting *pro se*.

18

1 disability benefits if her medical impairments are found severe at step two. This is not so.
2 There are three additional steps in the sequential evaluation process.

3      In her submissions to the Court, plaintiff also references numerous listed impairments,
4 perhaps implying that the ALJ erred at step three. But, the various listings pointed out by
5 plaintiff each only somewhat overlap with her claimed symptoms. Because she did not
6 demonstrate *all* of the required criteria necessary to meet or equal any particular listed
7 impairment, the ALJ correctly continued her analysis beyond step three.

8      The ALJ ultimately found that plaintiff was not disabled at step *five*. As for the ALJ's
9 evaluation of plaintiff's residual functional capacity, this finding is not directly challenged on
10 appeal. Insofar as plaintiff argues that some medical opinions from certain doctors should have
11 been given more weight, however, this is unpersuasive. The Court acknowledges that the ALJ
12 is responsible for making credibility determinations and resolving any conflicts in the medical
13 record. *Andrews*, 53 F.3d at 1039. Here, substantial evidence supported the ALJ's
14 interpretations of the medical testimony and resulting conclusions regarding plaintiff's residual
15 functional capacity. Based on the vocational expert's testimony with respect to such a
16 hypothetical individual, the ALJ properly found that plaintiff was not disabled.

## CONCLUSION

18      For the foregoing reasons, plaintiff's motion for summary judgment is **DENIED** and
19 defendant's cross-motion for summary judgment is **GRANTED**. Judgment will be entered
20 accordingly.

22      **IT IS SO ORDERED.**

24 Dated: July 12, 2005

                                    WILLIAM ALSUP
                                    UNITED STATES DISTRICT JUDGE